IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ELIZABETH A. HONSINGER and<br>LISA A. ALBRIGHT,<br><br>Plaintiffs,<br><br>vs.<br><br>UMB BANK, N.A. and<br>LORENE LOCKWOOD, in her capacity<br>as Personal Representative for the<br>Estate of James Lockwood,<br><br>Defendants. | Case No. 06-0018-CV-W-ODS |

## ORDER AND OPINION DENYING MOTION TO EXCLUDE EXPERT TESTIMONY

### I.  INTRODUCTION

Pending is Defendant UMB Bank, N.A.'s ("UMB") Motion to Exclude Testimony from certain of Plaintiff's expert witnesses.  The motion (Doc. # 82) is denied.

Plaintiffs, as trust beneficiaries, brought this suit alleging breach of trust, breach of fiduciary duties, negligence, and fraudulent concealment by Defendant Trustees. These claims arise from the sale of real property held in the trust; Plaintiffs allege Defendants acted improperly by valuing the property as vacant land capable of supporting residential development instead of valuing it as a quarry, thereby selling the land for much less than it was worth.  Plaintiff has designated Arthur Pincomb and John Wachter as expert witnesses, and both are the target of UMB's Motion to Exclude Testimony.

### II.  DISCUSSION

The use of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.  This rule permits the use of specialized knowledge if it will "assist the trier of

fact to understand the evidence or to determine a fact in issue," but only if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Rule 702 was promulgated following the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), which established the district court's role as a "gatekeeper" to insure that expert testimony is relevant, reliable, and helpful to the trier of fact. Case law establishes a list of factors that, depending upon the facts of the case and the field of expertise at issue, may be helpful in conducting this inquiry. However, there is no universal list of factors or requirements; the inquiry depends upon the nature and circumstances of the case at hand. Kumho, 526 U.S. at 150-51.

The Court of Appeals has also cautioned that district courts should not purport to resolve which expert's opinion is "better" or confuse matters of impeachment with matters of admissibility. For instance, "the factual basis of an expert opinion goes to the credibility of the testimony, and not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross examination. . . . . [O]nly if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." Larson v. Kempker, 414 F.3d 936, 941 (8th Cir. 2005) (internal quotations omitted).

A. Comparable Sales Approach to Valuation

Pincomb[1] utilized the comparable sales approach to determine the property's value was slightly more than $652,000 at the time of its sale. Defendant first contends Pincomb's reliance on the comparable sales approach should be disallowed because

---

[1] Pincomb's credentials include membership in the American Society of Appraisers and certification as a professional geologist. He also has extensive experience appraising mines and mineral deposits. Further discussion of Pincomb's expertise is unnecessary because UMB does not contest his qualifications.

2

the comparable sale approach is inherently unreliable when used to value mines and mineral deposits. Treatises and other experts agree that proper use of the comparable sales approach is difficult because of the paucity of sales of sufficiently similar property, but none of the materials cited suggest it is never permissible to use this valuation method. Moreover, other treatises and experts indicate a preference for use of the comparable sales approach if possible. Pincomb's testimony was consistent with the treatises cited by both parties: he conceded the difficulty in using the comparable sales approach, but explained the reasons why its use is preferred when it can be used. Pincomb Dep. at 28, 46-50. On some occasions he finds an appropriate basis for using this approach, and in others he does not. Pincomb Dep. at 28, 31, 35, 37, 43. Pincomb's opinion will not be excluded simply because he utilized the comparable sales approach.

UMB next argues that even if use of this method is theoretically permissible to value a mine, Pincomb lacked sufficient information to properly value the property in this case. The argument is presented from two perspectives. UMB first contends Pincomb deviated from his normal practices with respect to the information he sought and relied upon in conducting his appraisal, leaving him with insufficient information about the property he was appraising. This charge does not adequately recognize that Pincomb does not have a single "normal practice:" the information Pincomb obtains varies with the circumstances of the appraisal. For instance, different information is required if the mine is being valued as a business or going concern as opposed to the value of the property itself. E.g., Pincomb Dep. at 71, 73. Additionally, Pincomb obtains different information if he is conducting the appraisal for the owner or operator as opposed to some other party because an owner/operator is more forthcoming with an appraiser he, she or it has retained, but is typically unwilling to provide an outside party's appraiser with proprietary information. E.g., Pincomb Dep. at 69-70, 73. It is well-established that there are various pieces of information that do not exist or that Pincomb did not have; from this observation UMB invites the Court to infer Pincomb must have lacked the information necessary to appraise the property. The flaw in UMB's argument is that it presupposes the missing information was necessary to the appraisal. For instance,

3

information that did not exist or that Pincomb did not have becomes irrelevant if the information in question relates to valuing the mine as a business entity and not to valuing the property. Similarly, UMB has not demonstrated the information Pincomb had was so vital that it left him unable to apply the comparable sales approach. UMB's argument is essentially as follows: (1) Pincomb obtains certain information in performing some of his appraisals, (2) he did not obtain this information in this case, (3) therefore, his appraisal is unreliable. Accepting this analysis requires the Court to conclude the appraisal could not be done without the information in question – and UMB has not established this vital point.

UMB's second attack on the factual support for Pincomb's opinion involves the information he had about the sales of the allegedly comparable property. UMB presents a lengthy list of information Pincomb did not possess about the allegedly comparable sales. One critical failing, however, is the absence of any indication that this information is necessary or absolutely required. The appraiser's lack of information is not important if the information in question is irrelevant, replaceable, or of minimal importance in valuing the property. Differences may be minor or major depending on the circumstances, including the availability of substitute information, and the mere existence of differences or gaps in information do not preclude the use of the comparable sales approach. More importantly, as Larson indicates, flaws in the factual basis for the expert's opinion provide an opportunity for cross-examination, not exclusion of the opinion. Pincomb's opinion is not so lacking in foundation that it should be deemed legally inadequate.

### B. Royalty Income Approach to Valuation

Pincomb also appraised the property based on the royalty income approach, which values the income stream the property can generate. This approach resulted in a valuation of $675,000. In reaching his conclusion, Pincomb determined the property had 6.5 million tons of limestone reserves and operation of the quarry could generate

4

250,000 tons of limestone annually.  UMB contends these factual underpinnings are speculative and lack factual support.

UMB relies upon abundant evidence demonstrating that mining efforts on the property had not produced 250,000 tons of limestone – but that same evidence demonstrates the operation was conducted "sporadically" and temporarily, not on a consistent or permanent basis.  This history does not dictate what the quarry *could* produce if sufficient effort were put forth; it only demonstrates what had happened in the past.  While perhaps relevant to the pertinent inquiry, the history of production does not automatically limit the potential production.  Similarly, the fact that the property was not mined for ten years after its sale in 1996 does not preclude a qualified expert – such as Pincomb – from concluding the property could have been mined and would have produced significant amounts of limestone.  The actual use of the property does not dictate its potential.

With respect to the demand for limestone, UMB contends "unbiased third-party fact witnesses demonstrate that there was insufficient demand .. . to make it economically profitable to operate a quarry on the Gardner Property from 1996 to 2007."  UMB's Suggestions at 34.  To support this contention, UMB refers the Court to prior portions of its argument that establish the amount of limestone generated on the property – but this has nothing to do with the demand for limestone.  There is other anecdotal evidence offered to demonstrate the lack of demand or, more generally, the feasability of mining the property.  At best, this evidence creates a conflict relevant to the issue of credibility; it does not establish Pincomb's opinion is inadmissible.

Finally, UMB contends the material Pincomb relied upon to determine the amount of reserves is unreliable.  The reliability of the material may be a matter of dispute, but Larson dictates this is not a basis for excluding the testimony.

C.  Opinions Regarding Environmental Contamination

Defendant's expert, James Price, is an attorney with experience in environmental law and litigation.  In his report, Price offered opinions about the effect known and

5

Case 4:06-cv-00018-ODS   Document 117   Filed 11/14/07   Page 5 of 7

potential environmental risks would have had on the sale of the property.  In response, Pincomb issued a supplemental report addressing the viability of any environmental risk and the effect of certain indemnification provisions.  UMB contends these opinion are (1) untimely and (2) beyond Pincomb's expertise.

UMB candidly admits the Court established a deadline of April 30, 2007, for designating rebuttal opinions and Pincomb's rebuttal report was filed before that date.  UMB nonetheless contends the rebuttal report was untimely because the opinions expressed should have been contained in the initial report.  The Court disagrees with this characterization.  While Pincomb could have addressed environmental matters in his initial report, there was no apparent need for him to address the matter because it did not affect his valuation of the property.  The need to address environmental matters did not arise until Price submitted his report.  Finally, the Court discerns no prejudice, and the Court has difficulty striking a timely-filed report based on a subjective belief that it should have been filed earlier than it was.

UMB next contends Pincomb lacks the qualifications to opine on this matter because he does not have "a degree related to environmental analysis and there has been no showing that [he] has any training to perform environmental assessments."  UMB's Suggestions at 37-38.  The observations about Pincomb's background are true, but not dispositive.  Pincomb is qualified to value property, particularu mines.  He is therefore qualified to offer an opinion about matters that might affect the value of such property, including risks associated with environmental contamination.

### D.  Damage Calculations

Wachter is a trust officer at another bank, and he has provided an expert opinion wherein he calculated the damages suffered by the trust as a result of the sale of the property.  His calculations rely on Pincomb's valuation; UMB, anticipating the exclusion of Pincomb's opinions, suggests Wachter's opinions should also be excluded.  Inasmuch as the Court is not excluding Pincomb's valuation, Wachter's opinion will not be excluded.

6

UMB next contends Wachter's supplemental report should be excluded because the calculations expressed therein are inconsistent with both the calculations in his original report and his deposition testimony. Assuming, *arguendo*, that such a conflict exists, the Court does not believe it justifies striking aspect of Wachter's report(s) or proposed testimony. Ordinarily, a conflict between what a witness says at one time and what the witness says at another time presents grounds for cross-examination. The witness may or may not be able to explain the inconsistency; either way, the matter is one of credibility, not admissibility, and should be assessed by the finder of fact, not the Court.

### III. CONCLUSION

The Motion to Exclude Testimony of Plaintiffs' Designated Experts is denied.

IT IS SO ORDERED.

DATE: November 14, 2007

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT